**[Cite as *In re K.D.*, 2026-Ohio-1361.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: K.D.
     N.D.

C.A. Nos.    31662
                  31663
                  31664
                  31665

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 24 02 0098
                DN 24 02 0099

DECISION AND JOURNAL ENTRY

Dated: April 15, 2026

FLAGG LANZINGER, Presiding Judge.

**{¶1}** Appellants, D.D. ("Mother") and A.D. ("Father"), appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights to one of their minor children and placed the other child in the legal custody of the parents of the child's best friend ("Custodians" or "Mr. and Mrs. H."). This Court affirms.

I.

**{¶2}** Mother and Father are the divorced parents of K.D., born April 8, 2009; and N.D., born March 14, 2011. In 2017, the children were placed in the sole legal custody of Father in a prior juvenile court case. That case that is not part of the record in this appeal, but the children were apparently removed from Mother's custody because of her long history of untreated mental illness and substance abuse.

{¶3} Summit County Children Services Board ("CSB") filed complaints to commence the current cases pertaining to K.D. and N.D. on February 14, 2024. At that time, Mother was not involved in the children's lives, had not seen or spoken to them for many years, and CSB was initially unable to locate her.

{¶4} The agency's complaints alleged that K.D. and N.D. were abused, neglected, and dependent children because of Father's excessive physical discipline and verbal mistreatment of them and CSB's belief that Father had undiagnosed and untreated mental illness and/or substance abuse problems because he also behaved erratically, said things that made no sense, and expressed thoughts that other people were spying on him and/or out to get him. Father was charged with domestic violence and child endangering and other crimes for his alleged physical abuse of the children. Those charges remained pending throughout this case.

{¶5} The juvenile court removed the children from Father's custody and placed them in the emergency temporary custody of CSB. K.D. was placed in the home of Mr. and Mrs. H. (Custodians), the parents of her best friend, where she remained throughout this case. Initially, N.D. was also placed in the same home, but he exhibited serious behavioral problems. After less than two months, N.D. was removed from Custodians' home and placed in a residential mental health treatment facility. He remained in residential treatment for several months and was then relocated to a therapeutic foster home.

{¶6} Prior to the adjudicatory hearing, Mother received notice of these proceedings and contacted the juvenile court. Upon Mother's application, the court appointed trial counsel to represent her. Both parents appeared for a contested adjudicatory hearing with their respective trial counsel. After the hearing, the magistrate adjudicated the children abused and dependent. Specifically, the magistrate found that Father had repeatedly abused the children by using

excessive physical discipline; a recent incident had caused one of the children to suffer visible cuts and bruising; Father also verbally belittled and berated the children; and the children feared for their safety around him.

{¶7} The trial court later placed the children in the temporary custody of CSB and adopted the case plan as an order of the court. The parents did not file objections to the adjudications or initial dispositions of the children, nor did they appeal those judgments to this Court. Therefore, this case proceeded "'based on the unchallenged and conclusive adjudications' that Father had abused each child." *In re: B.D.*, 2026-Ohio-306, ¶ 20 (9th Dist.), quoting *In re A.S.*, 2025-Ohio-2621, ¶ 10 (9th Dist.), citing *In re H.F.*, 2008-Ohio-6810, ¶ 18.

{¶8} The trial court adopted the original and amended case plans, without objection from either parent. The case plans required Father and Mother to obtain mental health and substance abuse assessments, follow all treatment recommendations, and sign information releases to permit CSB to communicate with service providers; submit to regular drug screening; and demonstrate that they had stable income and housing and could otherwise meet the basic needs of the children. Specific goals for Father required him to engage in counseling to address his physical and verbal mistreatment of his children and his apparently unfounded thoughts that people were spying on him. Because Mother had not had contact with the children for several years, she was also required to consistently visit and develop a positive relationship with them.

{¶9} For the next year, Father and Mother refused to cooperate with CSB or the guardian ad litem and failed to comply with the reunification requirements of the case plan. Father obtained three separate mental health assessments, but he never engaged in counseling to address his inappropriate treatment of his children or erratic thoughts, as was explicitly required by the case plan. Instead, throughout this case, Father either denied that he had physically or verbally

mistreated his children or blamed Mother or the children themselves for his excessive discipline of them. Father did not engage in drug treatment and refused to submit to drug testing. Furthermore, he continued to exhibit erratic and "paranoid" behavior.

{¶10} Mother told the caseworker that she was already involved in mental health treatment, but she refused to sign releases to enable CSB to obtain information about her counseling or any other case plan compliance. Mother refused every drug screen that the caseworker requested, would not allow the caseworker to see where she lived, and maintained "[v]ery minimal" contact with the caseworker throughout this case. When Mother communicated with the caseworker, she was often agitated, confrontational, and/or accused the caseworker of lying about her.

{¶11} On January 6, 2025, CSB filed motions to place K.D. in the legal custody of Custodians and to place N.D. in the permanent custody of CSB. As grounds for its permanent custody motion, CSB alleged that it was in the child's best interest and that N.D. "cannot be placed with either parent within a reasonable time and should not be placed" with either parent under R.C. 2151.414(B)(1)(a), because four alternative factors applied to the parents: their failure to remedy the conditions that caused the child's continued removal from the home; chronic mental illness or chemical dependency that prevented them from providing the child with a suitable home; the parents' inability to provide the child with basic necessities or to prevent him from suffering physical abuse; and any other relevant factor. *See* R.C. 2151.414(E)(1), (2), (14), and (16).

{¶12} Each parent sought legal custody of both children and Father alternatively sought an extension of temporary custody. A visiting judge held a three-day hearing on the alternative dispositional motions. After considering the evidence, the trial court entered separate judgments to place N.D. in the permanent custody of CSB and to place K.D. in the legal custody of

Custodians. Mother and Father appeal and raise a total of six assignments of error. This Court will consolidate and rearrange some of their assigned errors to facilitate review.

II.

**MOTHER'S ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY TERMINATING MOTHER'S PARENTAL RIGHTS AND GRANTING PERMANENT CUSTODY OF THE CHILD [N.D.] TO [CSB].

**FATHER'S ASSIGNMENT OF ERROR II**

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF N.D. TO [CSB] AS THIS DECISION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND WAS NOT IN THE BEST INTEREST OF THE CHILD.

{¶13} Both parents challenge the merits of the trial court's decision to terminate their parental rights to N.D. and place the child in the permanent custody of CSB. Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). (Emphasis added.) R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶14} Father disputes the trial court's findings on both prongs of the permanent custody test, but Mother challenges only the trial court's determination that permanent custody was in the best interest of N.D. On the first prong of the permanent custody test, the trial court alternatively

found: that N.D. had been in the temporary custody of CSB for at least 12 months of a consecutive 22-month period, and that the child cannot be placed with either parent within a reasonable time or should not be placed with them. *See* R.C. 2151.414(B)(1)(d); 2151.414(B)(1)(a). Father disputes only the trial court's "12 of 22" finding, which CSB concedes is not supported by the record.

{¶15} It is evident from the trial court's judgment that it improperly based its "12 of 22" calculation on the 15 months that N.D. had been in CSB's temporary custody by the time of the final hearing. It is well settled that, for an agency to establish the "12 of 22" ground under R.C. 2151.414(B)(1)(d), a child must have already been in its temporary custody for 12 months at the time it moves for permanent custody. *See In re C.W.*, 2004-Ohio-6411, syllabus. When CSB moved for permanent custody of N.D. on January 6, 2025, the child had been in its temporary custody for less than nine months. Consequently, the trial court erred in finding that the "12 of 22" ground had been satisfied based on the facts in this record. Furthermore, CSB did not allege the "12 of 22" ground as a basis for its motion. *See In re J.M.*, 2010-Ohio-1967, ¶ 10-16 (9th Dist.) (emphasizing the parents' rights to due process in termination proceedings, and concluding that a trial court lacks authority to grant permanent custody on grounds that the agency did not allege in the permanent custody motion).

{¶16} Although the trial court erred in its "12 of 22" finding, to establish reversible error, Father must also demonstrate that he suffered prejudice because of the trial court's error. *In re W.B.*, 2017-Ohio-8780, ¶ 11 (9th Dist.). By its explicit terms, R.C. 2151.414(B)(1) requires the trial court to find by clear and convincing evidence that permanent custody is in the child's best interest and that "any" of the five factors set forth in R.C. 2151.414(B)(1)(a)-(e) apply in this case. Because those first prong factors are alternative findings, CSB needs to prove only one of those

grounds to support its motion for permanent custody. *In re J.B.*, 2018-Ohio-244, ¶ 9 (9th Dist.), citing *In re A.W.*, 2017-Ohio-7786, ¶ 17 (9th Dist.), and *In re E.M.*, 2015-Ohio-5316, ¶ 12 (9th Dist.). In this case, the trial court made an alternative first prong finding that N.D. could not or should not be placed in either parent's custody under R.C. 2151.414(B)(1)(a) and Father has not disputed that finding. By failing to challenge the trial court's alternative finding under R.C. 2151.414(B)(1)(a), Father cannot demonstrate that the trial court's erroneous "12 of 22" finding constituted reversible error. *See In re U.D.*, 2019-Ohio-512, ¶ 9 (9th Dist.).

{¶17} Both parents challenge the trial court's finding that permanent custody was in the best interest of N.D. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in R.C. 2151.414(D). *In re M.S.*, 2023-Ohio-1558, ¶ 25 (9th Dist.). The trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the child, the child's wishes and custodial history, the child's need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). None of the factors set forth in R.C. 2151.414(E)(7)-(11) apply in this case.

{¶18} During this case, the interaction between N.D. and Father was minimal. Because the juvenile court had determined that Father abused N.D., and N.D. was receiving counseling to address that trauma, CSB did not initially permit contact between Father and N.D. Although Father attempts to fault CSB for his lack of contact with N.D., the court ordered Father to engage in counseling to address his mistreatment of his children, but he never did. The case plan required Father to develop some insight into how his past behavior had negatively affected the children, to work toward repairing his relationship with them, and to demonstrate that he could act

appropriately around them. Father failed to work on any of those reunification requirements, however.

{¶19} Father and N.D. had a few phone conversations early in this case, but CSB later stopped that contact. N.D. wanted Father to apologize to him, but the caseworker and the guardian ad litem did not believe that Father was going to tell the child what he wanted to hear. Father made no progress toward recognizing how his physical and verbal abuse had affected his relationship with his children. In fact, long after the trial court had conclusively adjudicated the children as being abused by him, Father continued to deny that he had excessively disciplined or berated his children. CSB, in consultation with N.D.'s counselors and the guardian ad litem, did not permit Father to have further interaction with N.D. Consequently, Father had no more telephone contact with N.D. and was never permitted to see him in person during this case.

{¶20} After having no contact with N.D. for more than six years, Mother was permitted to have supervised weekly visits with N.D. during this case. Mother usually brought her current boyfriend, Mr. L., with her. Mr. L. was disruptive at the agency, confrontational with the caseworker, and N.D. did not know or feel comfortable around him, so CSB eventually prohibited Mr. L. from attending visits. After Mother visited N.D. on October 30, 2024, she missed the next three scheduled visits and was taken off the visitation schedule. Mother did not contact the caseworker about resuming visits with N.D. until shortly before the final hearing. Consequently, Mother had no contact with N.D. for most of this case.

{¶21} N.D. was 14 years old at the time of the hearing and had consistently expressed to the guardian ad litem and others that he did not want to live with either Father or Mother. The guardian ad litem believed that N.D. was mature enough to express his wishes in this case and

agreed that permanent custody was in the child's best interest. She explained that the child was doing well in his therapeutic foster home where he resided with two other teenaged boys.

{¶22} The custodial history of N.D. had included 15 months during this case living in three different temporary placements. Prior to this case, he had lived with Father and had no contact with Mother for several years. He apparently lived with Mother after the parents' divorce but was removed from Mother's home in a prior juvenile case. While living with Father, N.D. had been subjected to physical and verbal mistreatment. N.D. was engaged in ongoing counseling during this case to help him work through his past trauma. He needed a legally secure permanent placement, which neither parent could provide, and CSB had been unable to find a suitable relative to provide him with a stable home. The trial court reasonably concluded that a legally secure placement would be achieved by placing N.D. in the permanent custody of CSB.

{¶23} Mother and Father have failed to demonstrate any error in the trial court's decision to place N.D. in the permanent custody of CSB. Mother's first and Father's second assignments of error are overruled.

### MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY AWARDING LEGAL CUSTODY OF [K.D.] TO [CUSTODIANS].

### FATHER'S ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN GRANTING LEGAL CUSTODY OF K.D. TO NON-RELATIVES, [CUSTODIANS,] AS THIS DECISION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND WAS NOT IN THE BEST INTEREST OF THE CHILD.

{¶24} Both parents challenge the merits of the trial court's decision to place K.D. in the legal custody of Custodians. An award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence.

> Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of a child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 2016-Ohio-2685, ¶ 7 (9th Dist.).

{¶25} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal citations and quotations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶26} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 2016-Ohio-1330, ¶ 12 (9th Dist.). No specific test or set of criteria is set forth by statute regarding an award of legal custody, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the children. *In re B.B.*, 2016-Ohio-7994, ¶ 18 (9th Dist.), quoting *In re N.P.*, 2004-Ohio-110, ¶ 23 (9th Dist.).

{¶27} The juvenile court is guided by the best interest factors enumerated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 2008-Ohio-5003, ¶ 9 (9th Dist.), citing *In re T.A.*, 2006-Ohio-4468, ¶ 17 (9th Dist.). As relevant here, those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, and the child's need for permanence. *See* R.C. 2151.414(D)(1)(a)-(d). The juvenile court may also

consider the best interest factors in R.C. 3109.04(F)(1). *In re K.A.*, 2017-Ohio-1, ¶ 17 (9th Dist.). While many factors overlap with those set forth in R.C. 2151.414(D)(1), additional factors that are relevant in this case are the child's adjustment to "home, school, and community[ ]" and the proposed custodian's likelihood to honor and facilitate visitation or parenting time. R.C. 3109.04(F)(1)(d),(f).

{¶28} During this case, K.D. had little to no interaction with her parents. At the beginning of this case, Mother reconnected with K.D. following an absence from the child's life for over six years, which was nearly half of K.D.'s life at that point. After two visits, K.D. decided that she did not want to continue to visit Mother. Due to her age and maturity, K.D.'s counselor, the caseworker, and the guardian ad litem agreed that K.D. was old enough to make that choice.

{¶29} As with N.D., no visits were initially scheduled between Father and K.D. because of Father's abuse of the children. Unlike her brother, K.D. never expressed a desire to have any contact with Father but insisted that she did not want to see or speak to him. Father also made no progress in counseling to address his past mistreatment of K.D. and his strained relationship with her.

{¶30} In contrast to K.D.'s strained and distant relationships with her parents, her interaction and interrelationships with Custodians and their family were consistent and positive. Throughout this case, K.D. resided with Custodians and their daughter, who had been K.D.'s best friend since before this case began. K.D. had adjusted well to living in their home, where she had been able to stay in the same middle school and then transition to high school in the same school district. She was doing well academically, was involved in extracurricular activities during the school year, and was working a summer job with the city department of parks and recreation. Custodians testified at the hearing about their love for K.D. and discussed some of the recreational

activities that they enjoy together as a family. Mrs. H. described K.D. as being like a sister to their daughter and Mr. H. explained that K.D. is "just like another daughter to me now[.]" All witnesses agreed that K.D. was thriving in Custodian's home.

{¶31} Throughout this case, K.D. consistently expressed that she did not want to live with either of her parents. The guardian ad litem opined that K.D. was an intelligent 16-year-old girl and was mature enough to decide where she wanted to live. She also recommended that K.D. be placed in the legal custody of Custodians because that permanent placement was in the child's best interest.

{¶32} K.D.'s custodial history had included being removed from Mother's custody long before this case began for problems that are not detailed in the record, except that Mother had a history of untreated mental illness and substance abuse. K.D. then lived with Father until this case began. While K.D. lived with Father, at some point, Father began physically and verbally abusing her and N.D. K.D. had a close friend, Custodians' daughter, and had spent time at their home before this case began. During this case, K.D. spent more than one year living in Custodians' home and was doing well there. By the time of the final hearing, K.D. was 16 years old and needed a legally secure permanent home so she could complete high school and prepare for her future as an adult. Custodians were prepared to provide a long-term stable home for K.D., but her parents were not.

{¶33} Finally, both Custodians testified at the hearing and expressed a willingness to honor the parents' residual rights to visitation with K.D., if the juvenile court ordered visitation, and testified that they would also honor the parents' other residual rights. The trial court reasonably concluded that legal custody to Custodians was in K.D.'s best interest. Mother's second and Father's third assignments of error are overruled.

**FATHER'S ASSIGNMENT OF ERROR I**

THE COURT ERRED IN NOT GRANTING FATHER A FIRST SIX-MONTH
EXTENSION OF TIME WHEN, BY CLEAR AND CONVINCING EVIDENCE,
THE EXTENSION WAS IN THE BEST INTEREST OF THE CHILD[REN],
THERE HAD BEEN SIGNIFICANT PROGRESS ON THE CASE PLAN OF THE
CHILD[REN], AND THERE WAS REASONABLE CAUSE TO BELIEVE
THAT THE CHILD[REN] WOULD BE REUNIFIED WITH FATHER OR
OTHERWISE PERMANENTLY PLACED WITHIN THE PERIOD OF THE
EXTENSION[.]

{¶34} Father's first assignment of error is that, rather than placing his children in their respective permanent placements, the trial court should have ordered a first six-month extension of temporary custody to allow him more time to work on the reunification requirements of the case plan. Although Father's stated assignment of error refers to a singular child, his argument refers to both children. Consequently, this Court will construe this assignment of error as pertaining to both K.D. and N.D.

{¶35} Father recognizes that a trial court is authorized to grant a first six-month extension of temporary custody under R.C. 2151.415(D)(1) only if it finds, by clear and convincing evidence, "that the extension is in the best interest of the child[ren], there has been significant progress on the case plan of the child[ren], and there is reasonable cause to believe that the child[ren] will be reunified with one of the parents or otherwise permanently placed within the period of extension."

{¶36} To begin with, the trial court explicitly found that the evidence demonstrated that neither parent had made progress on the reunification requirements of the case plan. Specifically, the court emphasized that "Mother has not significantly participated, and Father refuses to accept the results of the adjudicatory hearing and demeans the children, [CSB], and the [guardian ad litem]." Although Father refers to "significant progress on the case plan" in his stated assignment of error, he has failed to develop a factual argument or point to specific evidence that disputes the trial court's finding that the parents had made no progress on the case plan. Neither parent engaged

14

in case plan services or cooperated with CSB or the guardian ad litem throughout this case. Despite a conclusive adjudication that Father physically and verbally abused his children, he continued to deny that he had behaved inappropriately and refused to accept any responsibly for his family's situation in this case.

{¶37} Moreover, an extension of temporary custody was not in the best interest of the children, and the trial court did not have "reasonable cause to believe" that the children would be placed with either parent within the extension period. Aside from Father and Mother failing to work on the case plan, both children insisted that they did not want to live with either parent but wanted to settle into a safe and secure permanent placement and move on with their lives.

{¶38} Because Father has failed to demonstrate that the statutory requirements for a first extension of temporary custody had been satisfied in this case, the trial court did not err in refusing to grant an extension of temporary custody. Father's first assignment of error is overruled.

### FATHER'S ASSIGNMENT OF ERROR IV

FATHER'S COUNSEL WAS INEFFECTIVE IN FAILING TO ASSIST FATHER IN PRESENTING HIS EVIDENCE TO THE COURT IN SUPPORT OF HIS PENDING MOTIONS FOR LEGAL CUSTODY OF THE MINOR CHILDREN IN THESE ACTIONS.

{¶39} Finally, Father asserts that his trial counsel was ineffective for failing to present evidence to support Father's motion for legal custody. To establish a claim of ineffective assistance of counsel, Father must demonstrate that his trial counsel's performance was deficient and that the deficient performance prejudiced his case. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A "deficient performance" is one that fell below an objective standard of reasonableness. *Id*. at 687-88. To establish prejudice, Father must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 694.

**{¶40}** Father argues that he received ineffective assistance because his trial counsel failed to present any evidence to support his motion for legal custody of his children. Father fails to point to any evidence that his trial counsel should have presented to support his motion for legal custody. *See State v. Powell*, 2012-Ohio-2577, ¶ 86. Absent specific evidence that would have made a difference in the outcome of the hearing, Father has not established that his counsel's actions in failing to present evidence on Father's behalf constituted ineffective assistance. *See In re J.S.*, 2011-Ohio-985, ¶ 19 (9th Dist.).

**{¶41}** As explained above, CSB presented overwhelming evidence that the best interest of the children supported the trial court's decisions to permanently place N.D. and K.D. outside Father's custody. Father had physically and verbally abused each child while they were in his custody; he had failed to seek counseling or gain any insight into how his treatment of his children was inappropriate or negatively affected their mental health and their relationship with him; and neither child had any desire to live with Father again.

**{¶42}** Father has failed to demonstrate that there was any evidence that his trial counsel could have presented that would have changed the outcome of these proceedings. Therefore, he has failed to demonstrate that his trial counsel was ineffective, and his fourth assignment of error is overruled.

III.

**{¶43}** The parents' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JILL FLAGG LANZINGER
FOR THE COURT

HENSAL, J.
STEVENSON, J.
CONCUR.

APPEARANCES:

WESLEY JOHNSTON, Attorney at Law, for Appellant.

RONALD T. GATTS, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and ASHLEE JAMES, Assistant Prosecuting Attorney, for Appellee.

ANNETTE POWERS, Guardian ad Litem.